**LAW OFFICES OF BRYAN W. PEASE**
Bryan W. Pease (SBN 239139)
302 Washington St. #404
San Diego, CA 92103
Ph. (619) 723-0369
Email: bryan@bryanpease.com

**LAW OFFICES OF G. DAVID TENENBAUM**
G. David Tenenbaum (SBN 150629)
269 S. Beverly Drive #1041
Beverly Hills, CA 90212
Ph. (312) 404-7723
Email: g.davidtenenbaum@gmail.com

**LAW OFFICES OF CASEY D. GISH**
Casey D. Gish (SBN 206289)
5940 S. Rainbow Blvd.
Las Vegas, NV 89118
Ph. (702) 583-5883
Email: casey@gishlawfirm.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA SATO, an individual; ROXANNE LOPEZ, an individual; DILEY GREISER, an individual; and CHELSEA WARD, an individual; and JAMIE GREGORY, an individual; <br><br> Plaintiffs, <br> v. <br><br> COUNTY OF SAN BERNARDINO; SAN BERNARDINO COUNTY | Case No. 5:20-cv-01876 <br> Hon. Jesus G. Bernal <br> Mag. Sheri Pym <br><br> **SECOND AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1

| | |
|---|---|
| SHERIFF'S DETECTIVE BRIAN GRIMM, an individual; SAN BERNARDINO SHERIFF'S DEPUTY J. GREGORY, an individual; SAN BERNARDINO SHERIFF'S SERGEANT DARREN GILMORE, an individual; and DOES 1-10,<br><br>        Defendants. | |

## INTRODUCTION

1.     Defendants are *still,* six months later, in the midst of an inter-state campaign of harassment, intimidation, and terror they began in September 2020 against animal rescuers, reporters, and anyone else who may know the whereabouts of dozens of German Shepherd dogs that the San Bernardino Sheriff's Department initially called on community members to help rescue from horrific conditions on unimproved land in the middle of the desert, but then determined should instead be returned to their abusers.

2.     On August 9, 2020, multiple sources within the San Bernardino Sheriff's Department put out frantic calls for help to community members that San Bernardino Animal Control had seized dozens of German Shepherds abandoned in the desert, but had also left about 80 behind, and had already euthanized many of those seized. Rescue groups and other Good Samaritans sprang into action and rescued the animals left behind at their own expense and acting as volunteers. These groups and individuals acted *at the direction of a San Bernardino Sheriff's Deputy*, who was on scene and instructing the rescuers where the dogs were located.

3.     Defendants have ever since been misrepresenting facts to obtain warrants in California and Nevada, harassing and interrogating Plaintiffs and others repeatedly despite being advised that all are represented by counsel, confiscated some Plaintiffs' cellphones and computers from their homes, and have been threatening to come back again to do the same thing all over again.

2

SECOND AMENDED COMPLAINT

4.      The purpose behind Defendants' actions appears to be to mitigate liability of the San Bernardino Sheriff's Department regarding dogs having been rescued at the behest of Sheriff's deputies, and the "attack dog" business that is threatening to sue for hundreds of thousands of dollars, owned by Alla Zorikova. The website of this illegal and unpermitted business was http://www.vonmarkgrafgermanshepherds.us/. However, after being exposed and driven out of the County of San Bernardino by code enforcement as well as a temporary restraining order ("TRO") obtained by Plaintiffs' counsel in state court requiring Zorikova to comply with basic laws regarding shelter and care of animals, Zorikova has since moved to Riverside County and set up a new website to conduct her business from, http://www.vonschutz.com/.

5.      A true and correct copy of the TRO obtained by Plaintiffs' counsel in state court, which resulted in Zorikova moving her illegal operation to Anza, California in Riverside County, is attached hereto as Exhibit 1.

6.      Defendants know there is no valid basis for any criminal charges against Plaintiffs or any individuals believed to have been involved in rescuing and/or placing the abandoned dogs from unimproved land in the desert in August 2020, because multiple Sheriff's deputies affirmatively called and *asked* volunteer rescue groups to step in and rescue the dogs, who had been abandoned without food, water, or shelter. All of the rescue groups and individuals involved were acting as volunteers, and no one was paid for rescuing any animals.

7.      Yet, Defendants have been showing up at multiple animal rescue volunteers' house in California and Nevada merely suspected of having information, interrogating them for hours despite being informed the parties are represented, separating them from their children, and treating them like criminals, all ostensibly for the purposes of locating the abused and neglected animals for purposes of returning them to their abusers. Defendants even showed up at the home of a *news reporter* in Nevada demanding information about the whereabouts of the dogs.

SECOND AMENDED COMPLAINT

## JURISDICTION AND VENUE

8.    This action arises under 42 U.S.C. § 1983.  The Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343.

9.    Venue under 28 U.S.C. § 1391 in this Court is proper as a substantial part of the events or omissions giving rise to the claims alleged occurred in San Bernardino County, which is within the Central District of California. Additionally, all Defendants reside in San Bernardino County.

## PARTIES

10.    Plaintiff CHRISTINA SATO is an individual residing in San Bernardino County. Ms. Sato is a real estate agent who volunteers virtually all of her free time rescuing animals and working with organizations that provide free service animals to veterans and first responders affected by post-traumatic stress disorder ("PTSD"). In addition to her love of animals, Ms. Sato was inspired to do this by her son returning from service in Afghanistan with PTSD and needing a support animal, and finding that they typically cost thousands of dollars and are inaccessible to many returning veterans.

11.    Plaintiff ROXANNE LOPEZ is an individual residing in San Bernardino County and is the 31-year-old disabled daughter of Plaintiff Sato.

12.    Plaintiff DILEY GREISER is an individual residing in San Bernardino County. Ms. Greiser is employed as a firefighter and also volunteers much of her time rescuing animals and working with various animal rescue organizations, including one that she runs herself as a volunteer.

13.    Plaintiff CHELSEA WARD is an individual residing in Nevada and is the co-founder of Southern Nevada Animal Rescue ("SNARL"), a 501(c)(3) nonprofit animal rescue organization that she and her husband run as volunteers.

14.    Plaintiff JAMIE GREGORY is an individual residing in Nevada and is the founder of the Vegas Pet Rescue Project ("VPRP"), a 501(c)(3) nonprofit animal rescue organization she runs as a volunteer.

4

SECOND AMENDED COMPLAINT

15.     Defendant COUNTY OF SAN BERNARDINO is a municipal entity within the State of California.

16.     Defendant SAN BERNARDINO SHERIFF'S DETECTIVE BRIAN GRIMM is an individual residing in San Bernardino County, named in both his official and individual capacities.

17.     Defendant SAN BERNARDINO SHERIFF'S SERGEANT DARREN GILMORE is an individual residing in San Bernardino County, named in both his official and individual capacities.

18.     Defendant SAN BERNARDINO SHERIFF'S DEPUTY J. GREGORY is an individual residing in San Bernardino County, named in both his official and individual capacities. Plaintiffs are unaware of Defendant GREGORY'S first name and will amend the complaint to add it once determined.

19.     Plaintiffs are informed and believe and thereon allege that each of the fictitiously named DOE Defendants is responsible in some manner for the acts, omissions, and damages alleged herein. Plaintiffs are unaware of the true names and capacities of the DOE Defendants, and, therefore, sues these Defendants under such fictitious names. Plaintiffs are informed and believe and thereon alleges that each of said fictitiously named Defendants was the agent, servant and employee of each and every other Defendant acting within the course and scope of his or her agency and employment, and with the knowledge, ratification and consent of each respective principal. Plaintiffs will seek leave to amend this Complaint when their true names and capacities have been ascertained.

20.     Regarding all actions and causes of action herein alleged and stated, all Defendants (including all DOE defendants) violated clearly established statutory or constitutional rights held by Plaintiffs that they had a mandatory duty to uphold.  No reasonable governmental official similarly situated to any of the Defendants could have believed that his/her conduct was lawful or within the bounds of reasonable discretion. As a result, all individual Defendants, including all individual DOE defendants, lack

immunity from suit or liability under either statutorily created immunity or the judicially created doctrine of "qualified immunity".

## ALLEGATIONS OF FACT

**A.    San Bernardino Sheriff's Department asks for help rescuing animals**

21.    On August 9, 2020, multiple San Bernardino County Sheriff's deputies contacted various animal rescue groups regarding a case of cruelty, abandonment, and neglect of German Shepherds in the desert and requested these volunteers remove neglected and abused dogs from property located near Hinkley, CA, a remote town that is in the outskirts of Barstow, CA.

22.    The location of the property where the dogs were found was extremely remote, miles and miles into the middle of the desert, on vacant land. There were no dirt roads, no running water, or any housing structures.  These dogs were quite literally left alone and abandoned in the desert.

23.    The dogs did not have any housing or shelter from the extreme elements of the blistering desert heat, which is a violation of California law[1] and San Bernardino County code.[2] The day that rescuers were on property, it was 104 degrees. Most of the

---

[1] California penal code 597(b) provides: "Except as otherwise provided in subdivision (a) or (c), every person who overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, drink, or shelter, cruelly beats, mutilates, or cruelly kills any animal, or causes or procures any animal to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived of necessary sustenance, drink, shelter, or to be cruelly beaten, mutilated, or cruelly killed; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather, or who drives, rides, or otherwise uses the animal when unfit for labor, is, for each offense, guilty of a crime punishable pursuant to subdivision (d)."

[2] San Bernardino County code 32.0113 provides: Every person within the County of San Bernardino who owns, conducts, manages, or operates any animal establishment for

dogs had dug holes in the ground over time to try to escape the heat because they had zero shelter. And those were the lucky ones. Some were permanently confined to small wire cages which offered no protection from the elements, which constitutes torture. Some were illegally tied up around the neck with chains.[3] Among the dogs rescued were pregnant females. Failing to provide adequate shelter; permanently confining dogs; and tying up dogs in extreme heat is a violation of California cruelty laws, and constitutes abuse and neglect.

---

which a license is required by this Chapter, shall comply with each of the following conditions:

(a)   Housing facilities for animals shall be structurally sound and shall be maintained in good repair to protect animals from injury and restrict entrance of other animals.

(b)   All animals and all animal buildings or enclosures shall be maintained in a clean and sanitary condition.

(c)   All animals shall be supplied with sufficient good wholesome food and water as often as the feeding habits of the respective animals require.

(d)   Animal buildings and enclosures shall be so constructed and maintained as to prevent the escape of animals.

(e)   All reasonable precautions shall be taken to protect the public from the animals and animals from the public.

(f)   Every building or enclosure wherein animals are maintained shall be properly ventilated to prevent drafts and to remove odors.  Heating and cooling shall be provided as required according to the physical needs of the animals.

(g)   All animal rooms, cages, and runs shall be of sufficient size to provide adequate space for clean water and proper housing for animals kept therein.

(h)   All animal runs shall be approved construction and shall be provided with adequate waste and manure disposal and for drainage into an approved sewer or individual sewer disposal installation.

[3] California Health and Safety code, division 105, part 6, chapter 8, section 122335 makes it illegal to tether a dog for longer than 3 hours in a 24-hour period. Further, California Penal Code 597(t) states that "every person who keeps an animal confined in an enclosed area shall provide it with an adequate exercise area. If the animal is restricted by a leash, rope, or chain, the leash, rope or chain shall be affixed in such a manner that it will prevent the animal from becoming entangled or injured and permit the animal's access to adequate shelter, food and water."

SECOND AMENDED COMPLAINT

24.     Notably, while there were 80+ dogs living on the property, there were absolutely no feces on the ground; and veterinarians later confirmed the dogs' bellies were full of their own feces. Given there was not a single pile of feces, they were apparently consuming the same out of necessity. Failure to properly feed animals constitutes malnourishment and is reflective of abandonment and neglect. There was no running water on the property, or electricity, or any housing structure for humans to live in. The land was totally vacant with only a small makeshift shanty or shed that was filthy. The shed had no toilet, sink, shower or bed. Therefore, the dogs' alleged owners did not live there,[4] which indicates the dogs were left alone for long periods of time,[5] while tied up or caged in the middle of the desert and without food or water (or human interaction/companionship). They were exposed to predatory animals. There were dead animal carcasses all over (large bones and skulls) the property, which were possibly other dogs and animals that were used as food, or dogs that had died due to exposure or predators. The property smelled of decomposing flesh. There were two live goats that may have been slated as food for the dogs, and a chicken, which was perhaps intended to feed the dogs.[6] It also appeared, and smelled, that there was a rotting deer carcass that may have been being used to feed the dogs. These conditions all reflect a life of cruelty, abandonment and terrible neglect.

25.     There was only one drum of liquid on the property. It contained red liquid and was covered in bugs. The dogs had no access to water to drink. Every single dog at the property was dehydrated, panting and extremely thirsty. Not one of the dogs had water available to it when the rescuers arrived. This fact alone is a violation of San

---

[4] The arrest record of the dogs' alleged owner, Alla Zorikova, lists her address as 1905 Wilcox Ave #175, Los Angeles, CA 90068, which is a UPS store.

[5] California penal code 597(s) makes it illegal to willfully abandon an animal.

[6] Ms. Zorikova and Ms. Jeong's website (vonschutz.com) claims they feed their dogs raw meat only.

SECOND AMENDED COMPLAINT

Bernardino County code 32.0113(c). Upon their arrival, rescuers provided water in pans for the dogs to drink.

26.     A San Bernardino Sheriff's Deputy advised some of the rescuers prior to entering the unimproved land containing the dogs that the dogs' alleged owners did not own the land. Rather, this deputy believed the land was owned by the Bureau of Land Management.

27.     Ms. Zorikova and Ms. Jeong represent themselves to be breeders of "protection dogs" which is based out of Los Angeles; and whose dogs are trained to bite (http://www.vonschutz.com). Pursuant to San Bernardino County Code, it is illegal to have more than 5 dogs on the property without a breeder license or kennel permit.[7] Additionally, training dogs to bite and be aggressive amounts to cruelty and neglect.[8]

28.     The dogs that were rescued were all full of parasites[9] (including the pregnant dogs), which constitutes cruelty and reflects a life of abandonment and horrible neglect. Some showed signs of malnourishment and being underweight. Dogs had hookworms, round worms, and hernias; and some were double crypto. All were inbred as evidenced by widespread umbilical hernias and un-descended testicles throughout the population. Some had fractured teeth, which the veterinarians have advised is indicative of dogs trying to chew through their metal chains or metal enclosures, or even eating

---

[7] San Bernardino ordinance 32.0301 defines a kennel as a place where more than 5 dogs are kept; and 32.0302 requires a permit. San Bernardino ordinance 32.0306 requires kennels to be disinfected and cleaned; and requires animals have access to "clean food and water" among other things.

[8] Ms. Zorikova and Ms. Jeong are training animals to violate California Health and Safety codes 398 and 399 relative to biting; and potentially to be fighting dogs pursuant to California penal code 597.5 and 597(b). Further, training animals to be dangerous or vicious violates Title 3, Division 2, Chapter 14 of San Bernardino local ordinances.

[9] San Bernardino ordinance 32.0306 requires kennel operators take preventative measures to prevent outbreaks of parasites.

SECOND AMENDED COMPLAINT

rocks. Veterinarians documented burnt paw pads, distended abdomens, and diarrhea in these dogs.

29.     These dogs were very sick and their medical conditions were left untreated by Ms. Zorikova and Ms. Jeong. The dogs all had filthy coats, and were covered in dirt and sand from living a lifetime in the open desert. They all had extreme amounts of dirt in their ears, and unkept nails, some so long that the nails were growing into the pads of the dogs' feet. Others had green discharge from their nose, and loops of intestines. None of the dogs appeared to have been vaccinated against rabies, as required by California law and San Bernardino County code, nor was the property adequately fenced.

30.     Ms. Zorikova and Ms. Jeong's website indicates they had puppies that were born on July 29, 2020. If true, the puppies would have been 10 days old by August 8 when animal control officers appeared at the property. When rescuers arrived, a San Bernardino Sheriff's deputy told the rescuers that Ms. Zorikova and Ms. Jeong had already removed the puppies from their nursing mother (the puppies were reportedly found in the shed). Removing puppies this young from their mothers is also a violation of animal cruelty laws. Ms. Zorikova and Ms. Jeong refused to identify the nursing mother to animal control officers. Therefore, officers were unable to obtain nourishment for the puppies. Because 10-day old (or three-week-old) puppies likely cannot survive without their nursing mother, Ms. Zorikova and Ms. Jeong are liable for cruelty and neglect for failing to identify the mother to animal control.

31.     Upon Ms. Zorikova and Ms. Jeong's arrest for animal cruelty, only the 14 puppies were immediately seized by animal control, which euthanized the puppies.

32.     Upon the release of Zorikova and Jeong from jail on animal cruelty charges, San Bernardino Animal Control returned all dogs they had seized in the days after these animal cruelty arrests, and the charges were then mysteriously dropped.

33.     Ms. Zorikova and Ms. Jeong's website indicates that they sell their "protection dogs" for up to $55,000, and they are willing to ship them anywhere. It is doubtful anyone would buy a parasite infested dog with broken teeth that is supposed to

be a "bite dog" for $55,000. Therefore, Ms. Zorikova and Ms. Jeong are committing fraud by advertising the sale of healthy dogs without a license. It is also not likely that these dogs would withstand being shipped in their condition.

**B.    Defendants begin terrorizing suspected animal rescuers**

34.    On September 3, 2020, Defendants showed up at Ms. Sato's home and claimed they had a search warrant, which they did not produce. About 20 minutes passed before Defendants finally produced a search warrant. During this time, Defendants ordered Ms. Sato to remain on her porch, and to "sit down" while they went inside and looked through her house before producing any warrant.

35.    Ms. Sato's 9-year-old granddaughter was present and is now afraid of Sheriff's deputies, since Defendants barged into her room and scared her, causing her to hide behind the curtains.

36.    Defendants misrepresented facts to obtain the overbroad warrant and searched the home of Ms. Sato, seized several items, including her iPhone, her laptop, her daughter's laptop that she needs for work, and mail addressed to Ms. Sato.

37.    Ms. Sato's 31-year-old disabled daughter, Plaintiff Roxanne Lopez, lives with Ms. Sato and had her arm in a cast on this day from recent surgery. Defendants frightened Ms. Lopez, grabbed her by the arm that was in a cast, and tried to put her in handcuffs, causing further injury to her arm.

38.    Defendants came in screaming and yelling loudly, treating the Sato family like criminals, and terrified a dog Ms. Sato had just rescued who was already afraid of humans and is now having even more severe behavioral issues, including gnawing his own arm severely, requiring antibiotics.

39.    Ms. Sato regularly volunteer for animal rescue organizations as a foster and transporter. Ms. Sato has been doing this all her life and has never been paid for it. There have been other situations where dogs have been abandoned in the desert in the past, and Ms. Sato has helped transport such animals. Ms. Sato believes Defendants suspect her of being involved in this particular event because of a Facebook post about her volunteer

animal rescuing activities, and Defendants are targeting animal rescuers in the area.

40.     Ms. Sato's other daughter who lives with her is 26-years-old, an EMT, and recently finished firefighter training school. She works nights and is applying for firefighting jobs. When Defendants took this daughter's laptop, she informed them that all of her certificates were on it and she needed it for a firefighting job application due the next day. She and Ms. Sato also informed Defendants the laptop belonged only to her and not to Ms. Sato. Defendants did not care and took the laptop anyway, which they have still refused to return.

41.     Ms. Sato is afraid for her and her family's safety and security of her property, and that Defendants will keep coming back, taking phones and computers, leaving her without the ability to communicate. Having phones and computers seized has impacted Ms. Sato's and her daughter's work, and her ability to communicate. Ms. Sato will suffer irreparable harm if her and her family's property is not returned, and Defendants ordered not to continue seizing phones and computers from them.

42.     On September 9, 2020, Defendants searched the home of Plaintiff Diley Greiser, seized several items belonging to her and her husband, including an iPad, bank statement, and cellphone.

43.     Ms. Greiser informed Defendants at the time she has an attorney and to call him, but Defendants refused to stop questioning Plaintiff for several minutes. Defendant Grimm then finally called Plaintiff's attorney, Bryan Pease. After Defendant Grimm finished talking to Plaintiff's attorney, who instructed him again not to question Ms. Greiser and to direct all questions to counsel, Defendants continued questioning and interrogating Ms. Greiser.

44.     Defendant Gilmore threatened to send more officers back to again search Plaintiff's home and look for more phones.

45.     Ms. Greiser is employed as a firefighter and also runs an animal rescue nonprofit, which she does as a volunteer. Plaintiff relies on her phone to communicate with others and run her rescue. Plaintiff does not have a landline. Without a phone,

Plaintiff's husband and Plaintiff would not even be able to call 911 in an emergency.

46.     Plaintiff Greiser is afraid for her and her family's safety and security of their property, and that Defendants will keep coming back, taking phones and computers, leaving them without the ability to communicate, and will prevent them from running Plaintiff's animal rescue nonprofit. Plaintiff will suffer irreparable harm if her and her family's property is not returned, and Defendants ordered not to continue illegally seizing  phones and computers.

47.     On September 10, 2020, Defendant Grimm arrived at the home of Chelsea and Thomas Ward in Nevada. The Wards co-founded and run a 501(c)(3) nonprofit animal rescue group called Southern Nevada Animal Rescue League ("SNARL"). Defendant Grimm said he had a search warrant, and asked to search the home. Ms. Ward asked to see the warrant, to which Grimm replied it would be there in a few minutes. Ms. Ward told him to come back when he had a warrant and closed the door. Several minutes later, Defendant Grimm produced the warrant and made Ms. Ward stay on the porch while his partner searched her home.

48.     This search took three hours, during which time Grimm continuously interrogated Ms. Ward despite having been previously informed by Ms. Ward's attorney and by Ms. Ward that he was to direct all questions to Ms. Ward's attorney, Casey Gish. This is even stated in the warrant in describing a phone call Ms. Ward had with Defendant Grimm and her attorney prior to this search. The warrant also contains a number of misrepresentations about what was said.

49.     Officers asked Mr. Ward to kennel a dog the Wards had just rescued that was in their bedroom, because the dog was acting frantically. As Mr. Ward did so, the frightened animal defecated all over the bedroom floor. Mr. Ward attempted to clean it up, but the officers ordered him to leave it. This meant the defecation stayed on the Ward's bedroom carpet for three hours while the officers went through their home. The officers took photos of the defecation in the bedroom that they had caused and refused to allow Mr. Ward to clean up, and they called Child Protective Services ("CPS") to report

SECOND AMENDED COMPLAINT

it. CPS then came and interviewed the Ward's children separately after the officers had finished their three hour search, claiming it was due to the dog defecation in the bedroom.

50. CPS asked the Ward's children how they feel about their parents rescuing animals. CPS also went around the neighborhood knocking on all the neighbors' doors, asking if they had seen evidence of child abuse, which the neighbors said was not the case. The Ward's neighbors came over afterwards to make sure they were okay after seeing multiple law enforcement vehicles surrounding the Ward's home, followed by CPS canvassing the neighborhood.

51. Defendant Grimm's officers also took photos of everything in the Ward's home, including dishes in the sink from a dinner the previous night that had not been cleaned yet. During the search, Defendant Grimm even made us put our 14 year old senior dog outside for over an hour while officers searched their home. Despite repeatedly asking him, he would not allow the Wards to bring our dog inside.

52. Defendant Grimm said he was investigating the theft of German Shepherds from the desert in San Bernardino.

53. The German Shepherds SNARL received from San Bernardino that had been rescued from the desert in San Bernardino by other rescues who called SNARL for help adopting the animals all required extensive medical treatment. An example of one of the dog's veterinary charts is attached hereto as Exhibit 2.

54. SNARL spent thousands of dollars on caring for these dogs, including spaying and neutering them. When SNALR adopted them out, SNARL only received the standard adoption fee of $500-$700 dollars, which covered about one fourth of the veterinary costs SNARL incurred.

55. The rescue groups SNARL obtained these dogs from rescued them from the desert *at the direction of* San Bernardino County Sheriff's deputies after the people responsible for dumping them there were arrested and booked into jail on animal cruelty charges.

SECOND AMENDED COMPLAINT

56. Defendants also showed up at the home of Plaintiff Jamie Gregory the next day, September 11, 2020, with a search warrant also obtained with false statements. Defendants had 10 officers who were not wearing masks during the pandemic inside Gregory's home tossing everything upside down, and eventually seizing two laptops and Gregory's cellphone.

57. Gregory offered to let Defendants look through her laptops and phone on the spot and told Defendants she could not afford to purchase another computer and phone and to please not take her property. Defendant Grimm took the property anyway.

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

**(All Plaintiffs against Grimm, Gilmore, and Gregory, and Does 1-10)**

58. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though each were set forth herein in full.

59. Title 42 U.S.C. § 1983 states in pertinent part: "Every person who, under color of [law] subjects, or causes to be subjected, any person of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law [or equity]."

60. The Fourth Amendment protects against unlawful and unreasonable seizure of property and persons.

61. The Fourteenth Amendment protects against deprivation of property without due process of law.

62. Defendants deprived Plaintiffs of their Constitutional rights guaranteed to them by the Fourth and Fourteenth Amendments to the United States Constitution by improperly seizing their phones and computers without probable cause, and refusing to return this property.

63. Defendants also deprived Plaintiffs of their Fourth Amendment rights by improperly seizing their persons during the unlawful searches of Plaintiffs' homes.

64. At no time did Plaintiffs give consent to Defendants' actions.

SECOND AMENDED COMPLAINT

65. In committing the acts and omissions alleged herein, Defendants acted under the color of state law.

66. In committing the acts and omissions alleged herein, Defendants acted with malice, oppression and fraud, and with the intent to cause harm and/or offense to Plaintiffs.

67. In response to Plaintiffs' request for a temporary restraining order in this case, Defendants submitted a redacted copies of the warrants issued for the Sato, Greiser, and Ward residences, as well as a redacted copy of the Application and Affidavit for Search Warrant for the Ward residence. (ECF Nos. 14-1 – 14-4.) Detective Grimm claimed the redaction was needed "due to the ongoing investigation." (ECF No. 14-1 at p. 3:25-26.)

68. Plaintiffs have been able to independently obtain this document that was filed in Nevada. A true and correct copy of the Application and Affidavit for Search Warrant for the Ward residence is attached hereto as Exhibit 3, with only the address redacted. Plaintiff Ward is named as Chelsea Moore, which was Plaintiff's name prior to marriage, and still on her California driver's license.

69. The portions of the Application and Affidavit that Defendants redacted in their opposition to Plaintiffs' ex parte application state:

> On Saturday, August 8, 2020, San Bernardino County Sheriff's deputies responded to 46535 Lockhart in the unincorporated Community of Hinkley, in San Bernardino County, to investigate reported animal cruelty. During the investigation deputies located approximately 60 German Shephard's [sic] without food, water and adequate shelter. The suspects were arrested and booked into jail for Felony Cruelty to Animals. While the suspects were in custody, San Bernardino County Animal Control Officers responded to the location and took possession of 24 of the German Shepherds. Officers were not able to take the remaining 30 plus German Shepherds. An unknown person notified several animal rescues about the dogs still being on the property. The animal rescues responded to the property and stole numerous German shepherds, one dog has a value of approximately $10,000.00.

On Wednesday, August 12, 2020, Chelsea Moore called the San Bernardino Sheriff's Department and said she was in possession of some of the stolen German Shepherds and wanted to speak with a Watch Commander.

On Monday, August 31, 2020, Detective Grimm contacted Chelsea Moore, the President of Southern Nevada Animal Rescue League, (SNARL), to ask about any involvement or knowledge of the stolen dogs from 46535 Lockhart, located in the unincorporated area of Hinkley. While Detective Grimm was on the phone with Moore, she asked to include an additional person into the phone conversation. Casey Gish got on the phone and identified himself as the attorney for SNARL. Casey Gish works at the Law Office of Casey Gish and is a civil attorney.

Gish confirmed knowledge of the stolen dogs. Gish said representatives of SNARL went to an unknown bar in the area of Barstow and met with other animal rescue organizations who were requesting assistance in placing the dogs. Gish confirmed, SNARL took about 20 dogs but was not certain on the exact number. The dogs are no longer physically in the care of SNARL. Detective Grimm asked Gish if SNARL had information where the dogs were placed after they took possession. He confirmed SNARL did have that information but he refused to provide any documentation of where the stolen dogs were placed. Gish is compiling a separate investigation and is going to provide his documentation of abuse to the dogs to several government agencies. Detective Grimm requested for Gish to provide him with any information about who contacted him and or facilitated taking possession of the dogs. Gish refused to provide any information in that regard. Gish instructed Moore not to speak with Detective Grimm without him being present. Moore was on the phone during the complete phone interview.

Detective Grimm tried to locate a separate business location for SNARL and during his conversation with Moore and Gish. Gish denied having a rescue center where they house animals. Detective Grimm believes a search of Moore's residence will produce evidence of the theft of the German Shepherds.

70.    Thus, this redacted portion of the document, which Detective Grimm states in his declaration is redacted "due to the ongoing investigation," contains no information that is privileged. The redacted portion: 1) admits that "deputies located approximately 60 German Shephard's [sic] without food, water and adequate shelter," 2) the suspects,

who were the purported owners of these dogs the County is now siding with in its "theft" investigation, "were arrested and booked into jail for Felony Cruelty to Animals," and shockingly, 3) "***Officers were not able to take the remaining 30 plus German Shepherds***," admitting that the County simply abandoned these dogs on vacant, unimproved land in the middle of the desert with no food, water, or shelter.

71.    The affidavit then falsely claims, "An unknown person notified several animal rescues about the dogs still being on the property." The person is not unknown to Defendants. The County knows that the call to rescue came from within the San Bernardino County Sheriff's Department.

72.    The affidavit next falsely claims, "The animal rescues responded to the property and stole numerous German shepherds, one dog has a value of approximately $10,000.00." Rescuing German Shepherds abandoned on vacant land in the middle of the desert who had no food, water, or shelter, and no apparent owner, is not theft.

73.    The affidavit then admits "Chelsea Moore," referring to Plaintiff Chelsea Ward, "called the San Bernardino Sheriff's Department" and asked to speak to a watch commander about the German Shepherds that had been brought to her rescue organization. However, the affidavit falsely characterizes the dogs Ward was in possession of as the "stolen" German Shepherds.

74.    The affidavit then purports to describe a conversation with Ward and the attorney for her animal rescue, Casey Gish, who the affidavit characterizes as a "civil attorney." The affidavit then misrepresents what was said in that conversation, for instance claiming that Attorney Gish "confirmed knowledge of the *stolen* dogs."

75.    A true and correct copy of a Public Records Act ("PRA") response received by Plaintiffs' counsel from the County of San Bernardino code enforcement division on October 9, 2020 is attached hereto as Exhibit 4. The PRA request was concerning the same vacant land on which Alla Zorikova was arrested on animal cruelty charges, which Zorikova had informally named "1335 Trump Blvd., Barstow, CA 92311."

SECOND AMENDED COMPLAINT

76.     The PRA response states, "On 8/8/2020 SBCSD [San Bernardino County Sheriff's Department] found approx. 50 German Shepherds on the property, unclear how many dogs remain as of today." It also states that Zorikova was "Operating a kennel on a property listed as vacant with no established Primary use," there were "makeshift animal enclosures," and Zorikova "has filed a lawsuit against the SBCSD." Photos are included as well.

77.     Submitting false information under penalty of perjury to multiple courts in order to obtain warrants issued under false pretenses to harass and intimidate Plaintiffs and improperly invade their homes and seize their phones and computers in multiple states shocks the conscience and violates Plaintiffs' due process rights under the Fourteenth Amendment.

78.     Defendants acted with malice, oppression, and fraud in falsifying information to obtain these warrants. Defendants have ill-will towards Plaintiffs due to a mistaken belief that Plaintiffs "took the law into their own hands" by allegedly being involved in the rescue of German Shepherds left abandoned on vacant land in the middle of the desert, without food, water, or shelter, after the San Bernardino County Sheriff's Department decided to leave these dogs there to languish, and individual sheriffs' deputies put a call out to the community and animal rescuers to come help. Defendants improperly wish to punish and deter Plaintiffs from being involved in any further animal rescue activities.

79.     Accordingly, Plaintiffs are entitled to compensatory damages, punitive damages, attorney fees under 42 U.S.C. § 1988, and all applicable law, and any other such relief as the Court deems just and appropriate.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Municipal Liability
### (All Plaintiffs against County of San Bernardino)

80.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though each were set forth herein in full.

81.     The County of San Bernardino has an unconstitutional policy or custom of holding onto people's personal electronic equipment such as phones and computers for several months or more when seized as part of an investigation, despite having the ability to quickly copy the data and return the items, thus unreasonably depriving individuals of their property under the Fourth Amendment.

82.     This unconstitutional policy is a deeply engrained policy or custom, and it has also been implemented and/or ratified by a final decisionmaker, such as the elected sheriff and/or district attorney of the County of San Bernardino.

83.     Plaintiff Sato's phones and computers did not even have password protection on them. Thus, Defendants could easily have obtained the information they claimed to be after within minutes, instead of depriving Plaintiff of her property and ability to communicate, as well as severely impacting Plaintiff's family members' work.

84.     The true purpose behind Defendants' actions is not to obtain information related to a legitimate investigation, but instead to deter and punish Plaintiffs for perceived activism in the form of animal rescue that Defendants believe sidesteps their own official channels, despite the call to rescue these animals having come from other employees of the San Bernardino Sheriff's Department in the first place.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(1)     For a preliminary and permanent injunction requiring Defendants to destroy all photographs taken inside Plaintiffs' homes;

(2)     For general and special compensatory damages (including direct, indirect, and emotional damages), and punitive damages, in amounts to be determined by the trier of fact, against all Defendants.

(3)     For reasonable attorney's fees and costs and expenses of litigation, pursuant to United States Code §§ 1983-1988, and any other relevant statutory or case law, against all Defendants.

(4)   For such other and further legal and equitable relief as the Court deems just and proper.

Dated: March 19, 2021          By:    /s/ Bryan W. Pease
                                      Bryan W. Pease
                                      Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to each and every legal cause of action against each and every defendant.

Dated: March 19, 2021          By:    /s/ Bryan Pease
                                      Bryan W. Pease
                                      Attorney for Plaintiff

SECOND AMENDED COMPLAINT

# Exhibit 1

RECEIVED
OCT 16 2020

SUPERIOR COURT OF CALIFORNIA
SAN BERNARDINO COUNTY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

OCT 1 - 2020

BY _____
DEPUTY JAN HERNANDEZ

1

2

3

4

5

6

7

8

9   **SUPERIOR COURT OF CALIFORNIA**

10   **COUNTY OF SAN BERNARDINO**

| | |
|---|---|
| 11  ALLA ZORIKOVA, | ) CASE NO. CIVDS 2017383 |
| 12 | ) |
| | ) [~~PROPOSED~~] **ORDER** |
| 13         Plaintiff, | ) |
| vs. | ) |
| 14 | ) |
| TINA LAMEY, *et al.*, | ) |
| 15 | ) |
| | ) |
| 16         Defendants. | ) |
| | ) |
| 17 _____ | ) |
| | ) |
| 18 TINA LAMEY, | ) |
| | ) |
| 19         Cross-Complainant, | ) |
| vs. | ) |
| 20 | ) |
| ALLA ZORIKOVA, an individual; OLIVIA | ) |
| 21 JEONG, an individual; DMITREEVA ZINAIDA; | ) |
| an individual; URID SEMENIKIN, an individual; | ) |
| 22 VON MARKGRAF GERMAN SHEPHERDS, a | ) |
| California corporation; and DOES 1-25, | ) |
| 23 | ) |
| | ) |
| 24         Cross-Defendants. | ) |
| | ) |
| 25 _____ | ) |

26

27

28

1

1  IT IS HEREBY ORDERED:

2       Cross-Defendant Alla Zorikova, and anyone acting on her behalf, is hereby enjoined from

3  engaging in any of the following acts until this matter can be heard on notice:

4

5          • Keeping more than five dogs without a kennel permit and Special Use Permit,

6            pursuant to San Bernardino County Code ("SBCC") §§ 32.0301 and 32.0302;

7          • Keeping more than 15 adult dogs without a Conditional Use Permit;

8          • Failing to provide adequate housing for the protection of dogs from the elements,

9            pursuant to SBCC § 32.0304;

10         • Failing to provide access to clean food and water for dogs, pursuant to SBCC

11           § 32.0306;

12         • Failing to provide adequate housing facilities for dogs, pursuant to SBCC § 32.0113;

13         • Tethering a dog for longer than three hours in a 24-hour period, pursuant to Health &

14           Safety Code § 122335.

15

16      [The Court appoints _____ as a Receiver pursuant to Bus. & Prof.

17 Code § 17203 to oversee care and placement of the dogs.]

18      Plaintiff is ordered to appear on ~~November 18~~, *DECEMBER 9* 2020 at 9:00 a.m. in Department S22 of the

19 above-captioned Court via CourtCall and show cause, if any exists, why this temporary restraining order

20 should not remain in effect during the pendency of this action as a preliminary injunction.

21      Defendant may file supplemental moving papers by ~~October 26~~, *November 18* 2020. Plaintiff's opposition, if

22 any, is due by ~~November 4~~, *November 25, 2020* 2020. Defendant's reply, if any, is due by ~~November 10~~, *December 1* 2020.

23

24 IT IS SO ORDERED.

25

26 Dated: *10-14-2020*

                 By: _____

27                     JUDGE OF THE SUPERIOR COURT

                    **BRYAN F. FOSTER**

28

[PROPOSED] ORDER

Exhibit 2

## VOLUNTARY VETERINARY STATEMENT FORM
### CLARK COUNTY ANIMAL CONTROL

DATE OF SERVICE: 8·27·20

ACTIVITY NUMBER:

DESCRIPTION OF ANIMAL: Male neutered (recent) German Shepherd

CONDITION OF ANIMAL:

Emaciated, neutered w/in last week, mild scrotal swelling
nasal discharge, coughing, diarrhea
Ribs visible, spine + hips protruding through a thick
shepherd coat

NATURE OF TREATMENT:

Antibiotics, deworming, GI protectants

PROGNOSIS: open depending on response to treatment

VETERINARY HOSPITAL NAME: Grand Montecito Animal Hospital

VETERINARIAN NAME: Rosemary Stolzer

ADDRESS: 6325 Grand Montecito Pkwy

PHONE NUMBER: 702-656-1115

VETERINARIAN SIGNATURE:

OFFICER NAME:

OFFICER NUMBER:

OFFICER PHONE: 702-455-7710

OFFICER FAX: 702-455-8102

# Exhibit 3

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

STATE OF NEVADA )
                 )   ss:
County of Clark   )

Detective **A. Antoniewicz**, being first duly sworn, deposes and states the he is the Affiant herein and is a Detective with the North Las Vegas Police Department presently assigned to investigate Possession of Stolen Property. The Affiant has been employed with the North Las Vegas Police Department for the past 18 years and has been assigned to the Detective Bureau for the past 13 years.

That there is probable cause to believe that certain property hereinafter described will be found at the following premises, to wit:

████████████, **North Las Vegas, NV 89031, County of Clark, State of Nevada. More particularly described as a two story, single family residence, that is tan in color with brown trim. The numbers 28 are posted in black numbers on the south side of the residence, east of the garage door. The front door of the residence is brown in color and faces south.**

The property referred to and sought to be seized consists of the following:

### Documentation:

Any written or electronically stored documentation relating to the possession, treatment or sales of the stolen German Shepherds from 46535 Lockhart Road, Hinkley CA. Also, any documentation which may indicate who the German Shepherds were sold to or placed with. To include all business or personal records documenting the above mentioned stolen German Shepherds. Affiant also requests to include any personal electronic devices which may contain evidence proving the theft or possession of the stolen German shepherds. The German Shepherds were stolen August 8, 2020 and August 12, 2020.

### Electronic Storage Devices & Hardware

Electronic storage devices consist of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar transmission, reception, collection and storage of data. Electronic storage device includes (but is not limited to) any wireless/cellular telephone, cordless telephone, pager, fax machine, digital camera, audio recorder, video recorder and any data-processing device e.g. central processing units, memory typewriters, self- contained "laptop", "notebook", "mini-notebook", or "personal data assistant" computers. Internal and external storage devices e.g. fixed disks (hard drives), memory cards, floppy disk,

Page -1-

LS-120, zip drive, jazz drive, Orb drive, CD drive, DVD drive, diskettes, tape drives, optical storage devices, transistor-like binary devices, and other memory storage devices including the storage media used in the devices.

Peripheral input/output device e.g. as keyboards, printers, scanners, plotters, video display monitors, optical readers.

Related communication devices e.g. modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices. Any device, mechanism, or parts that can be used to restrict access to electronic storage devices e.g. physical keys and locks bio metric readers, retinal scanners, facial recognition, signature verification, smart card or voice authentication.

**Software**

Computer/Equipment software (digital information) can be interpreted by electronic storage device equipment, computers and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communication programs.

**Documentation**

Electronic storage device documentation consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use electronic storage device hardware, software, or other related items.

**Passwords and Data Security Devices**

Electronic storage device passwords and other data security devices are designed to restrict access to or hide software, documentation, or data. Data security devices may

consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, dongles, biometric readers, retina scanners, facial recognition systems, voice authentication systems, hand writing authentication systems and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt; compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

That Affiant is satisfied that there is probable cause to believe that said property is located as set forth above and that based upon the Affidavit attached hereto there are sufficient grounds for the issuance of a Search Warrant.

The property described constitutes evidence which tends to demonstrate the criminal offense of Possession of Stolen Property, has been committed at the premises to be searched in violation of Nevada Revised Statute 205.275.

In support of your Affiant's assertion to constitute the existence of probable cause the following facts are offered based on Affiant's personal knowledge and on information and belief.

On August 31, 2020, Affiant received correspondence from North Las Vegas Police Department Sergeant Nellis to contact San Bernardino County Sheriff's Department in reference to assistance needed in our jurisdiction.

On September 1, 2020, Affiant contacted Detective Brian Grimm (employee #E3906), who was the lead investigator on a grand larceny case that occurred in their jurisdiction (SBCSD case #082001074). Detective Grimm needed assistance in obtaining a search warrant for ▮▮▮ ▮▮▮ in North Las Vegas. Detective Grimm provided the following facts for the case:

On Saturday, August 8, 2020, San Bernardino County Sheriff's deputies responded to 46535 Lockhart in the unincorporated Community of Hinkley, in San Bernardino County, to investigate reported animal cruelty. During the investigation deputies located approximately 60 German Shepard's without food, water and adequate shelter. The suspects were arrested and booked into jail for Felony Cruelty to Animals. While the suspects were in custody, San Bernardino County Animal Control Officers responded to the location and took possession of 24 of the German Shepherds. Officers were not able to take the remaining 30 plus German Shepherds. An unknown person notified several animal rescues about the dogs still being on the property. The animal rescues responded to the property and stole numerous German shepherds, one dog has a value of approximately $10,000.00.

On Wednesday, August 12, 2020, Chelsea Moore called the San Bernardino Sheriff's Department and said she was in possession of some the stolen German Shepherds and wanted to speak with a Watch Commander.

On Monday, August 31, 2020, Detective Grimm contacted Chelsea Moore, (DOB ▮▮▮ ▮▮▮ ), the President of Southern Nevada Animal Rescue League, (SNARL), to ask about any involvement or knowledge of the stolen dogs from 46535 Lockhart, located in the unincorporated area of Hinkley. While Detective Grimm was on the phone with Moore, she

asked to include an additional person into the phone conversation. Casey Gish got on the phone and identified himself as the attorney for SNARL. Casey Gish works at Law Office of Casey Gish and is a civil attorney.

Gish confirmed knowledge of the stolen dogs. Gish said representatives of SNARL went to an unknown bar in the area of Barstow and met with other animal rescue organizations who were requesting assistance in placing the dogs. Gish confirmed, SNARL took about 20 dogs but was not certain on the exact number. The dogs are no longer physically in the care of SNARL. Detective Grimm asked Gish if SNARL had information where the dogs were placed after they took possession. He confirmed SNARL did have that information but he refused to provide any documentation of where the stolen dogs were placed. Gish is compiling a separate investigation and is going to provide his documentation of abuse to the dogs to several government agencies. Detective Grimm requested for Gish to provide him with any information about who contacted him and or facilitated taking possession of the dogs, Gish refused to provide any information in that regard. Gish instructed Moore not to speak with Detective Grimm without him being present. Moore was on the phone during the complete phone interview.

Detective Grimm tried to locate a separate business location for SNARL and during his conversation with Moore and Gish. Gish denied having a rescue center where they house animals. Detective Grimm believes a search of Moore's residence will produce evidence of the theft of the German Shepherds.

Moore provided Detective Grimm with her home address of ████████ Avenue (North Las Vegas, NV 89031) which Detective Grimm was able to also confirm with a records/system's check.

WHEREFOR, Affiant requests that a Search Warrant be issued directing a search for and seizure of the aforementioned items at the location set forth herein and authorizing a day time search between the hours of 7:00 a.m. and 7:00 p.m.

_A. Antoniewicz,_

SUBSCRIBED and SWORN to before me by
A. Antoniewicz this _10_ day of _September_ , 2020.

JUDGE

# Exhibit 4

385 N. Arrowhead Ave, First Floor, San Bernardino, CA 92415 | Phone: (909) 884-4056 • Fax: (909) 387-8217

*www.SBCounty.gov*



## Land Use Services Department
### Code Enforcement
## NOTICE OF VIOLATION

TO:  **ZINAIDA, DMITREEVA ETAL OR
JEONG, OLIVIA** _____  **NOTICE DATE:**  __10/13/2020__

**ASSESSOR'S PARCEL NUMBER:**  __0502-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__  **CASE #:**  __C202002475__

**SITUS ADDRESS:**  __1335 TRUMP BLVD BARSTOW CA 92311_____

**MAILING ADDRESS:**  ███████████████████████████

**THE INDICATED VIOLATION(S) OF THE INTERNATIONAL PROPERTY MAINTENANCE CODE AND/OR THE SAN BERNARDINO COUNTY CODE WERE OBSERVED ON THE SUBJECT PROPERTY DURING AN INSPECTION CONDUCTED ON____10/02/2020_____:**

☐ IPMC 302.8 - **Motor Vehicles**: No inoperative motor vehicle shall be parked, kept, or stored on any premises other than in a garage.
Corrective Action: _____
_____

☐ IPMC 108.1.4 - **Unlawful Structures:** An unlawful structure that was erected, altered, or occupied contrary to law.
☐ Room Addition ☐ Garage Conversion ☐ Patio Cover ☐ Decking ☐ Carport ☐ Residence / Manufactured ☐ Shed-Cargo Container-Barn-Animal Enclosure
Corrective Action: _____
_____
_____
_____
_____

☐ IPMC 108.1.5(7) - **Dangerous Structure on Premises:** The building or structure is neglected, damaged, dilapidated, unsecured, abandoned, or an attractive nuisance.
Corrective Action: _____
_____

☐ IPMC 102.2 - **Maintenance:** Structure or premises shall be maintained in good working order.
Corrective Action: _____

☐ IPMC 302.7 - **Accessory Structures:** Accessory structures, including detached garages, fences and walls, shall be maintained, structurally sound, and in good repair.
Corrective Action: _____

☐ IPMC 308.1 - **Garbage:** Exterior and interior of property shall be free from any accumulation of rubbish or garbage.
Corrective Action: _____

☐ IPMC 504.1 - **Plumbing Systems and Fixtures:** Plumbing fixtures shall be properly installed and maintained in working order.
Corrective Action: _____

☐ IPMC 506.1 - **Sanitary Drainage:** Plumbing fixtures shall be properly connected to either a public sewer system or an approved private sewage disposal system.
Corrective Action: _____

☐ IPMC 602.2 - **Heating Facilities:** Dwellings shall be provided with heating facilities.
Corrective Action: _____

☐ SBCC 41.2503 – **Rental Dwelling Unit License Required:** A license is required for the operation of each rental dwelling unit.
Corrective Action: _____

☐ SBCC 84.25.070 A & C – **Occupancy/Camping:** It is unlawful to temporarily or permanently occupy any vehicle or temporary structure.
Corrective Action: _____

☐ SBCC 84.04.090(h) – **Animal Density Standards:** The number of animals shall be within approved limits.
Corrective Action: _____

☒  SBCC 82.02.020(b) **No Primary Use - Vacant**
Corrective Action*:  Operating a kennel on a property listed as vacant with no established Primary Use is not allowed.
Remove 2 sheds, personal items, vehicles, dogs and makeshift animal enclosures.*

The indicated violations must be corrected within **30** days from the date of this notice.  A re-inspection of this property to verify compliance will be completed after _____**11/12/2020**_____ Failure to correct the existing violation(s) may result in the issuance of administrative citations and/or civil or criminal prosecution. A lien and a special assessment on the property tax roll may also be placed against the subject property to recover any regulatory costs incurred by the County.

If you have questions regarding this notice please contact Code Enforcement at (909) 884-4056 or (760) 995-8140.

Notice received by:  _____**Standard Mail**_____  Code Enforcement Officer:  ___**G. Arroyo**_____

==08/31/2020:== Referral received from T. Campos with veterinary services. ==Kennel operating on vacant parcel, POs living in tents and make shift storage units built on the parcel. On 8/8/2020 SBCSD found approx. 50 German Shepherds on the property, unclear how many dogs remain as of today.== There also a lot of discarded meat that is picks up daily from the Barstow butcher and uses to feed the dogs. Per T. Campos ==PO has filed a lawsuit against the SBCSD.== Photos taken by T. Campos saved to office links. E. Aguero

PROPERTY OWNER CONTACT

09/08/2020 Ella ███████████ called and would like a call back to know how to go about getting a kennel permit. P. Harris

PROPERTY OWNER CONTACT

09/09/2020: Ella, ███████████ would like to schedule the initial inspection on the property. She also stated that the meat on the property is used for composting. E. Aguero

FIELD INVESTIGATION

10/02/2020 Field investigation conducted at front fence with property owner Ella Zorikova. Ms. Zorikova did not consent to the investigation and all pictures were taken from the public right of way. Ms. Zorikova stated that she only stays on the property when dogs are present. There are 2 shed located on the property with one being metal and one wood Due to no consent to enter property i observed approximately ==13 dogs present on the property in individual makeshift cages with tarp being used to shade dogs.== 2 Sports utility vehicles were parked at the entrance of the property. Unable to determine if any disposed meat was present on the property.

Ms. Zorikova stated that she has attempted to obtain a kennel permit and I explained to her i was there to investigate the Land use Violation since the property is listed as vacant with no primary use. Ms. Zorikova stated she will attempt to get the kennel permit and if she cannot obtain permit she will leave the property. I explained to Ms. Zorikova that she must talk to planning. I gave Ms. Zorikova my business card and informed her I would be sending a notice. Ms. Zorikova provided me with an address to send notice to and asked any future communication to be with her attorney. I replied that is fine, but her attorney would need to contact Code enforcement and we will not reach out to them and it is her responsibility to keep her attorney informed not ours. Ms. Zorikova understood. Notice will be sent to address on file and also to address provided by Ms. Zorikova, ███████████ ███████████. G. Arroyo

NOTICE OF VIOLATION

Notice prepared on 10/07/2020 with a mail date of 10/13/2020. 30 day notice will be issued for the following violation: SBCC 82.02.020(b) No Primary Use - Vacant. Notice has been saved to office link and email has been sent to operations for regular mailing. G. Arroyo

NOTICE OF VIOLATION - MAILING:

10/13/2020: Notice of Violation mailed regular status with pictures and scanned to case file. Mailed to: ███████████. N. Candelario

NOTICE OF VIOLATION - MAILING:

10/13/2020: Notice of Violation mailed regular status with pictures and scanned to case file. Mailed to:
██████████████████████████████████. N. Candelario

































